**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| WANDA G. MIRANDA,<br><br>    **Plaintiff,**<br><br>         **v.**<br><br>DELOITTE LLP, DELOITTE TAX LLP,<br>DELOITTE & TOUCHE LLP, DELOITTE<br>SERVICES LLP, FRANCISCO A.<br>CASTILLO-PENNE, RICARDO VILLATE-<br>PRIETO, MICHELLE CORRETJER-<br>CATALAN, JOHN DOE, RICHARD DOE,<br>ABC, DEF INSURANCE COMPANIES,<br><br>    **Defendants.** | **CIVIL NO.** 12-1271 (FAB) |

**OPINION AND ORDER**

BESOSA, District Judge.

Before the Court are:

1.   Plaintiff Wanda G. Miranda's motion for partial summary judgment, statement of uncontested facts, and amended supporting memorandum, (Dockets 230, 230-1 & 248); the memorandum in opposition filed by defendants Deloitte Tax LLP ("Deloitte Tax"), Deloitte Services LP ("Deloitte Services"), Deloitte LLP, Deloitte & Touche LLP ("Deloitte & Touche"), and Francisco Castillo-Penne ("Castillo"), Michelle Corretjer-Catalan ("Corretjer"), and Ricardo Villate-Prieto ("Villate") in their official capacities, (Docket 284); and plaintiff's reply, (Docket 313);

2.   the motion for summary judgment, supporting memorandum of law, and statement of uncontested facts filed by Deloitte Tax, defendants Castillo, Villate, and Corretjer in their official

capacities, (Dockets 225, 225-1, & 226); plaintiff's opposition
memorandum and opposing statement of facts, (Dockets 294 & 294-1);
and defendants' reply, (Docket 318);

   3.   the motion for summary judgment, supporting memorandum of
law, and statement of uncontested facts filed by Deloitte Services,
Deloitte LLP, and Deloitte & Touche, (Dockets 227, 227-1 & 228);
plaintiff's opposition, (Docket 293); and defendants' reply,
(Docket 316); and

   4.   the motions *in limine* in connection with the testimony
and sworn statements of Maria I. Silva-Silva, (Docket 182), and
Edileen Soto-Salicrup, (Docket 176).

## I.   Summary Judgment Standard

   The Court may grant a motion for summary judgment "if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a).  The party moving for summary judgment has the
initial burden of "demonstrat[ing] the absence of a genuine issue
of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  The party must demonstrate this absence with definite and
competent evidence.  See Maldonado-Denis v. Castillo-Rodriguez, 23
F.3d 576, 581 (1st Cir. 1994).  It must identify "portions of 'the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any'" which support its
motion.  Id.  (citing Fed.R.Civ.P. 56(c)).  Once a properly

supported motion has been presented, the burden shifts to the non-moving party "to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).

If the non-moving party establishes uncertainty as to the "true state of any material fact, the movant's efforts should be deemed unavailing." See Lopez & Medina Corp. v. Marsh USA, Inc., 694 F. Supp. 2d 119, 123 (D.P.R. 2010) (citing Suarez v. Pueblo Int'l., 229 F.3d 49, 53 (1st Cir. 2000)). It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). It is therefore necessary that "a party opposing summary judgment must 'present definite, competent evidence to rebut the motion.'" Maldonado-Denis, 23 F.3d at 581 (internal citation omitted). In making this assessment, a court must take the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 779-80 (1st Cir. 2011).

## II.  ADEA Age Discrimination Claim

Both plaintiff and defendants seek summary judgment of plaintiff's ADEA age discrimination claim. When, as here, the employee offers no direct evidence of discrimination, a three-step burden-shifting framework applies in ADEA claims.

Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)).  The employee must first show:  (1) that she was at least forty years old when the adverse employment action was taken against her; (2) that her job performance met the employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that the employer filled the position, thereby showing a continuing need for the services that she had been rendering.  Melendez v. Autogermana, Inc., 622 F.3d 46, 50 (1st Cir. 2010).  Once established, the *prima facie* showing "gives rise to a rebuttable presumption that the employer engaged in intentional age-based discrimination."  Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995) (citations omitted).  The burden of production then shifts to the employer "to produce sufficient competent evidence to allow a rational fact-finder to conclude that a legitimate non-discriminatory reason existed for the termination."  Melendez, 622 F.3d at 50.  If the employer meets its burden, the employee must then prove that the employer's reason is pretextual, and that "the record evidence would permit a reasonable jury to infer that the real reason was discriminatory animus" based on an impermissible consideration.  Id. (internal quotations and citation omitted).

   **A.   *Prima Facie* Case**

         None of the parties disputes that the first, third, and
fourth *prima facie* elements are met in this case.  Plaintiff was 42
years old when she was discharged on May 25, 2011, and her position
was subsequently filled by two other employees at Deloitte Tax.
(Dockets 230-1 at pp. 35-36; 284-1 at pp. 53-56.)   Defendants
argue, however, that plaintiff fails to satisfy the second element
of the *prima facie* case, that she was performing her job up to her
employer's legitimate expectations.   (Docket 284 at p. 6.)

         The Court finds unavailing defendants' argument that
plaintiff's job performance was inadequate because she was placed
on a Performance Improvement Plan ("PIP") before being terminated;
she had received ratings of 3s and 4s in her evaluations for fiscal
year 2010; and she had been expressly told that her performance was
below expectations.  As the First Circuit Court of Appeals has
advised, a court "cannot consider the employer's alleged
nondiscriminatory reason for taking an adverse employment action
when analyzing the *prima facie* case."  <u>Melendez</u>, 622 F.3d at 51
(internal quotations and citation omitted).   Accordingly, because
defendants invoke plaintiff's allegedly poor performance as a tax
manager in arguing that she was dismissed for non-discriminatory
reasons, the Court cannot rely on that performance in assessing
whether she satisfied the *prima facie* case's legitimate
expectations prong.  <u>See</u> <u>id.</u> ("If we were to consider [the

defendant's] stated reason for firing [the plaintiff] as evidence that [the plaintiff] was not meeting the company's expectations, we would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.") (internal quotations and citation omitted).

To establish that she was indeed meeting Deloitte Tax's legitimate expectations at the time of her dismissal, plaintiff points to her 17-year career beginning at Deloitte & Touche in 1990; relies on her position as the manager chosen to complete the tax preparations of the San Juan office's partners in 2010; and claims that her personnel file is devoid of any documentation that supports the issuance of the PIP. (Docket 248 at p. 5.) The Court agrees with defendants that simply because plaintiff allegedly had the necessary qualifications for the tax manager position does not automatically mean that she established a sufficient job performance. "Mindful that an employee's burden at the *prima facie* stage is not particularly onerous," however, the Court finds that the evidence is minimally sufficient to show that a triable issue exists as to her ability to meet Deloitte's legitimate expectations. See Melendez, 622 F.3d at 51. Defendants seem to agree: "It is disingenuous, to say the least, for plaintiff to suggest there are no issues of material fact with respect to her

meeting [the second] element of her *prima facie* case." (Docket 284 at p. 7.)

## B. Legitimate and Non-Discriminatory Reason for Dismissal

Even if plaintiff were able to meet all four elements of a *prima facie* case, defendants contend that a legitimate and non-discriminatory reason exists for firing plaintiff: her poor performance. (Docket 226 at p. 33.) They claim that as early as May 2010, defendants informed plaintiff that she needed to improve her performance; that due to her deficiencies she was put on a PIP on February 15, 2011; and that she was ultimately terminated on May 25, 2011 because she had failed to comply with the PIP and improve her performance. (Docket 226 at p. 33.) This is enough "to enable a rational factfinder to conclude that there existed a nondiscriminatory reason" for plaintiff's dismissal. Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 248 (1st Cir. 1997); see also Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) (employer's assertion that employee's discharge was due to deficient performance satisfied employer's burden of providing a legitimate, non-discriminatory reason).

## C. Pretext and Discriminatory Animus

At the final stage, the burden shifts to plaintiff to put forth sufficient facts for a reasonable fact-finder to conclude that defendants' proffered reason for discharging her is a pretext, and that the true reason behind the firing was a discriminatory

animus.  See Melendez, 622 F.3d at 52.  The First Circuit Court of Appeals has noted that a plaintiff may not merely dispute the truthfulness of the employer's justification.  Instead, he or she must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive:  age discrimination."  Id. (internal quotations and citation omitted).  The Court thus addresses plaintiff's allegation that the true reason behind her firing was age discrimination.

       The Court finds absolutely no evidence in the record pertaining to plaintiff's allegation of age-based discrimination in violation of the ADEA.  None of plaintiff's statements of uncontested facts supports any inference that any defendant so much as considered plaintiff's age, let alone based any adverse employment decision on it.  The only statement called to the Court's attention has been plaintiff's deposition testimony that "basically the age discrimination claim is that I'm over 40 years old when I was terminated, and basically my termination was unfair, unjust."  (Docket 226-1 p. 368.)  In the absence of any other evidence, the record is insufficient to enable a jury to find that the real reason behind defendant's dismissal of plaintiff was a discriminatory animus based on her age.  Accordingly, plaintiff's ADEA claim is **DISMISSED WITH PREJUDICE.**

## III. **Title VII Sex Discrimination Claim**

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  Sexual harassment is a form of sex-based discrimination.  <u>Vera v. McHugh</u>, 622 F.3d 17, 26 (1st Cir. 2010).  If an employer requires an employee "to work in a discriminatorily hostile or abusive environment," it violates Title VII.  <u>Gerald v. Univ. of P.R.</u>, 707 F.3d 7, 17 (1st Cir. 2013).  In order to prevail on a hostile work environment sexual harassment claim, a plaintiff must establish:  (1) membership in a protected class; (2) some basis for employer liability; and (3) unwelcome sexual harassment, which (a) was based on sex, (b) was sufficiently severe or pervasive, and (c) was objectively and subjectively offensive.  <u>Id.</u>  The Court discusses each element in turn.

There is no doubt (and no dispute from the defendants) that plaintiff, as a woman, is a member of a protected class.  The Court also finds a basis for employer liability because a supervisor — defendant Castillo — allegedly created the actionable hostile work environment, thus creating vicarious liability for the employer.

Gerald, 707 F.3d at 19-20.[1]  Accordingly, the first and second elements of a Title VII hostile work environment sexual harassment claim are satisfied.

Whether defendant Castillo's conduct was unwelcome would present a factual question for the jury.[2]  The evidence indicates that plaintiff was turned off and bothered by defendant Castillo's statements and behavior.  She classified his jokes as "indecent" and "lewd," and felt that defendant Castillo "went over the line" with his behavior towards her.  (Docket 200-4 at p. 3.)  She claims to have told Castillo directly that she didn't like his jokes, id. at pp. 9-10, and she also spoke to Ms. Tere Pascual — HR senior manager of Deloitte Services — on several occasions about the inappropriateness of Castillo's behavior.  Id. at pp. 4-9. Plaintiff reported her "concern about the jokes" to Ms. Pascual and "made her aware of what was happening to [plaintiff]."  Id. at p. 4.  That plaintiff had known defendant Castillo for 20 years,

---

[1] Defendants argue that they are entitled to the Faragher-Ellerth defense because Deloitte Tax has a well - established anti-harassment policy in place, and it took steps to correct any harassment on defendant Castillo's part.  (Docket 226 at pp. 13-19.)  As the First Circuit Court of Appeals recently clarified, however, "[t]he Faragher-Ellerth defense, which shields an employer from liability for a supervisor-created hostile work environment, **can only be raised if no tangible employment action is taken against the employee.**"  Gerald, 707 F.3d at 20 n.5.  In this case, a tangible employment action was taken because, at the very least, plaintiff was terminated.  Accordingly, the Faragher-Ellerth defense is inapplicable.

[2] As discussed below, the Court dismisses plaintiff's Title VII sexual discrimination claim for another reason.

heard his jokes frequently, and failed firmly to communicate her feelings about his jokes head on with him until after she had filed a complaint does not conclusively mean that the jokes were unwelcome. At the very least, that evidence would raise a factual question as to whether defendant Castillo's conduct was unwelcome — a question for the jury to decide. See Gerald, 707 F.3d at 17 ("In the context of sexual harassment claims, the question of 'whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact,' and this case is no exception.") (citing Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986).

Defendants next argue that plaintiff fails to show that her alleged discrimination occurred "because of her sex." The discriminatory incidents plaintiff relies upon, they argue, "are not gender specific[,] and there is no evidence that they affected women more than they did men." (Docket 226 at p. 9.) The Court is unpersuaded. For harassment to be "based on sex," it must be gender specific, but not necessarily motivated by sexual desire. Gerald, 707 F.3d at 17. Here, the record is sufficient for a reasonably jury to conclude that Castillo's actions were triggered by plaintiff's female gender. When plaintiff went to receive a flu shot at work, Castillo allegedly told the nurse to put the shot in plaintiff's buttocks, and imitated physical conduct of a sexual nature. (Docket 225-3 at pp. 55, 60.) When telling an off-colored

Civil No. 12-1271 (FAB)                                           12

joke at the office, Castillo allegedly asked plaintiff and two of her female co-workers if they had touched their husbands' "wichu" — which resembles the word "bicho," a Puerto Rican vulgar term for penis. Id. at p. 55. These two incidents alone are sufficient to suggest both that Castillo's jokes were directed at the female gender and that his actions towards plaintiff occurred because of her sex.

Because Title VII does not cover all harassing conduct, the alleged sexual harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" in order to be actionable. Vera, 622 F.3d at 26 (internal punctuation and citation omitted). "'There is no mathematically precise test to determine whether a plaintiff presented sufficient evidence' that he or she was subjected to a severely or pervasively hostile work environment." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (internal punctuation and citation omitted). The Court must consider all the circumstances, including (1) the frequency of the harassing conduct, (2) its severity, (3) whether it was physically threatening or humiliating as opposed to a mere offensive utterance, (4) whether it unreasonably interfered with an employee's work performance, and (5) the effect of the conduct on the employee's psychological well-being. Vera, 622 F.3d at 26. A hostile work environment claim is thus based upon the cumulative

effect of individual acts that may not by themselves be actionable.
Rivera-Garcia v. Sprint PCS Caribe, 841 F. Supp. 2d 538, 556
(D.P.R. 2012) (Perez-Gimenez, J.) (citing Nat'l. R.R. Passenger
Corp. v. Morgan, 536 U.S. 101, 115-116 (2002)).  Courts are tasked
with distinguishing:

> facts that merely add up to the ordinary tribulations of
> the workplace, such as sporadic use of abusive language,
> gender-related jokes, and occasional teasing, which can
> never support a Title VII claim, from those suggesting
> sexual remarks, innuendoes, ridicule, and intimidation[,]
> which may be sufficient to support a jury verdict for a
> hostile work environment.

Vera, 622 F.3d at 27.  Because this examination is fact specific,
it is normally best for the jury to decide, but "summary judgment
is an appropriate vehicle for policing the baseline for hostile
environment claims."  O'Rourke v. Providence, 235 F.3d 713, 729
(1st Cir. 2001) (internal citations omitted).

Undoubtedly, defendant Castillo's off-colored sexual jokes and
gestures constitute offensive and reprehensible conduct that is
inappropriate at any place of employment, especially at a
professional institution like Deloitte.[3]  Whether Castillo's
behavior rises to the level of being sufficiently severe or
pervasive *pursuant to Title VII's standard* would be a factual

---

[3] The Court is compelled by plaintiff's belief that her
incident report did not help curb Castillo's behavior and agrees
that "either nobody [at any of the Deloitte entities] did an
investigation[,] or [Castillo] just didn't care and kept doing the
same conduct that he was used to do[ing]."  (Docket 225-3 at
p. 61.)

question best left to the jury.[4]  For the reason discussed below,
however, the Court finds a fatal deficiency in plaintiff's case and
must dismiss her Title VII sexual harassment claim on other
grounds.

    Plaintiff has failed to put forth sufficient evidence from
which a reasonable jury could find that Castillo's harassment
altered the conditions of plaintiff's employment.  Nowhere in her
statement of uncontested facts does plaintiff include information
regarding the effects of Castillo's statements, jokes, gestures, or
behavior on her employment.  Instead, she merely claims that she
"felt intimidated, humiliated, and embarrassed over Mr. Castillo's
offensive conduct."   (Docket 230-1 at p. 32.)    Plaintiff's
deposition likewise indicates that she found Castillo's jokes to be
off-colored, lewd, and inappropriate, but the only effect on her
that the Court can glean is that they bothered her and made her
blush.  (Docket 225-3 at p. 29.)  She does not testify that the
ramifications of Castillo's behavior rose to a level even close to

_____

    [4] The First Circuit Court of Appeals has identified "behavior
like fondling, come-ons, and lewd remarks [as] often the stuff of
hostile environment claims." Billings, 515 F.3d at 48.  It has
also made clear, however, that there is no single type of behavior
essential to a successful hostile environment sexual harassment
claim.   Id. ("A worker need not be propositioned, touched
offensively, or harassed by sexual innuendo in order to have been
sexually harassed.") (internal citation omitted).  Given the range
of sexual jokes and physical gestures by defendant Castillo in this
case, it is beyond the Court's "policing" power to determine
whether Castillo's behavior was in fact severe or pervasive enough
to meet Title VII's standard.

interfering with plaintiff's work performance. Without any evidence in the record demonstrating that Castillo's harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, plaintiff's Title VII sex discrimination claim for sexual harassment must fail.[5] Accordingly, the Court **DISMISSES WITH PREJUDICE** plaintiff's Title VII sex discrimination claim.

## IV.  Title VII Retaliation Claim

When an employer discriminates against its employee because the employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing," the employer violates Title VII's anti-retaliation statute. 42 U.S.C. § 2000e-3(a); <u>Vera</u>, 622 F.3d at 32. A plaintiff must first make out a *prima facie* claim of retaliation by showing (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action. <u>Soileau v. Guilford of Me., Inc.</u>, 105 F.3d 12, 16 (1st Cir. 1997). A rebuttable presumption of unlawful retaliation then arises, and "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its

---

[5] Because the Court finds that plaintiff has failed to establish that defendant Castillo's conduct was sufficiently severe or persuasive so as to alter the conditions of her employment, it need not address the last element of a Title VII claim — whether the behavior was objectively and subjectively offensive.

employment decision." <u>Wright v. CompUSA, Inc.</u>, 352 F.3d 472, 478
(1st Cir. 2003) (citation and quotation marks omitted).  If the
employer presents evidence of a non-discriminatory reason for
firing the employee, "the presumption drops from the case and the
court must focus on the 'ultimate factual issue.'" <u>Vera</u>, 622 F.3d
at 32-33 (citing <u>U.S. Postal Serv. Bd. of Governors v. Aiken</u>, 460
U.S. 711, 715 (1983)).  In this case, the ultimate factual issue is
whether plaintiff has cited facts in the record from which a
reasonable jury could conclude that she experienced an adverse
employment action because she filed a sexual harassment complaint
against defendant Castillo.  <u>See</u> <u>id.</u> at 33.

The parties do not dispute that the first and second *prima
facie* elements of a Title VII retaliation claim are satisfied here:
plaintiff filed an internal grievance of sexual harassment on
October 6, 2010, which constitutes protected activity, and she was
terminated on May 25, 2011.  (Dockets 230-1 at pp. 2 & 32; 284-1 at
pp. 2 & 50.)  Defendants dispute only that plaintiff has met the
third element; they argue that the evidence does not show a causal

link between plaintiff's protected activity and the one[6] adverse

employment action taken against her — termination.  (Docket 226 at

p. 26.)

    Many sources of circumstantial evidence are capable of

demonstrating retaliation.  Mesnick v. Gen. Elec. Co., 950 F.2d

816, 828 (1st Cir. 1991).  A plaintiff may demonstrate causation,

for example, "by establishing that the employer's knowledge of the

protected activity was close in time to the employer's adverse

---

    [6] In accordance with a majority of other circuit courts of
appeals, the Court finds that PIPs are not adverse employment
actions.  See Reynolds v. Dep't of the Army, 439 Fed. Appx. 150,
153 (3d Cir. 2011); Cole v. Illinois, 562 F.3d 812, 816-17 (7th
Cir. 2009); Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1224
(10th Cir. 2006) (citing cases); Givens v. Cingular Wireless, 396
F.3d 998, 998 (8th Cir. 2005); But see Cancel de Rugg v. West, 106
F. Supp. 2d 289, 297 (D.P.R. 2000) (Fuste, J.) (finding that an
unsatisfactory performance evaluation and accompanying memorandum
informing an employee that she was being placed on a PIP
constituted adverse employment actions).  The Court does not,
however, subscribe to defendants' rationale that plaintiff's
negative employment reviews — issued two months after her internal
complaint was filed — cannot constitute adverse employment actions.
In Gu v. Boston Police Dept., the First Circuit Court of Appeals
explained that an employment action must "materially change" the
conditions of the plaintiff's employment, and that such material
changes include "unwarranted negative job evaluations."  312 F.3d
6, 14 (1st Cir. 2002) (quoting Hernandez-Torres v. Intercontinental
Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)).  Moreover, the
Supreme Court has explained that an adverse action in a retaliation
claim need not affect the terms or conditions of employment, but
must be the type of action that would discourage a reasonable
employee from engaging in protected activity.  Burlington N. &
Santa Fe Ry. Co. v. White, 548 U.S. 53, 62-63 (2006).  Especially
in a case like this, where a supervisor exercises dominant control
over the employee's corporate reviews, the Court finds that a
reasonable employee would be discouraged from engaging in protected
activity against that supervisor precisely because of the
supervisor's power to affect her employment file negatively.

action."  Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994)
(*per curiam*).   In this case, plaintiff submitted her internal
grievance on October 6, 2010. (Dockets 230-1 at p. 32 & 284-1 at
p. 50.)   Defendant Castillo spoke directly to her about that
grievance on October 13, indicating his knowledge of it shortly
after it was filed.  (Docket 225-3 at p. 37.)  Defendants admit
that "in a little more than four months," plaintiff was given
negative employment evaluations and placed on a PIP.  (Docket 226
at p. 27.)  The Court questions defendants' four-month timeline,
however, in light of defendant Castillo's estimate that the
negative evaluations and decision to issue a PIP occurred
approximately *two* months later at the mid-December 2010 consensus
meeting — a meeting in which Mr. Horst considered the input,
feedback, and recommendations from Mr. Castillo regarding
plaintiff. (Docket 229-3 at pp. 9–10.)  Especially in light of the
fact that the consensus meetings occurred only twice a year, the
temporal proximity in this case supports the *prima facie* element of
causation.  Mesnick, 950 F.2d at 828 (citing case law upholding a
one-year time period as well as a 9-month lapse between employees'
filing of a discrimination complaints and subsequent terminations);
see also Bibiloni Del Valle v. Puerto Rico, 661 F. Supp. 2d 155,
170 (D.P.R. 2009) (Acosta, J.) ("Depending on the particular set of
facts at hand, 'temporal proximity alone can suffice to meet the
relatively light burden of establishing a prima facie case of

retaliation.'") (quoting DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008)).

Temporal proximity is just one method of proving retaliation, Wyatt, 35 F.3d at 16, however, and "comments by the employer which intimate a retaliatory mindset" also constitute the type of evidence "sufficient to leap the summary judgment . . . hurdle[]." Mesnick, 950 F.2d at 828.  Furthermore, evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action also can suffice. Chungchi Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003); see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) ("[W]here there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that a causal connection exists); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) ("[T]he causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct . . . .").  Just days after plaintiff filed her grievance against defendant Castillo, he called her into his office and questioned her as to why, "after 20 years of friendship, why did you go to the Integrity [Help Line]?"

(Docket 235-1 at pp. 38–39.)  Additionally, plaintiff testified that Castillo indicated that she had "tainted his record" by reporting his behavior.  (Docket 235-1 at p. 11.)  Inferences may be drawn from defendant's statements (1) that he resented plaintiff for filing her grievance, and (2) that his participation in plaintiff's negative reviews just two months later, his support for issuing a PIP against plaintiff four months later, as well as his participation in the decision to fire plaintiff seven months later, were causally related to the sexual harassment grievance plaintiff had filed against him.  Defendants' contention that plaintiff received negative reviews in May 2010 — even before her complaint was filed — does not conclusively rule out the possibility that her year-end 2010 review, her PIP, and her termination in May 2011 were causally related to the grievance.

Keeping in mind that the *prima facie* case is "a small showing that is not onerous and is easily made," <u>Che</u>, 342 F.3d at 39 (citation omitted), the Court finds that plaintiff has set forth sufficient circumstantial evidence to meet all elements of a *prima facie* retaliation claim.  Furthermore, the First Circuit Court of Appeals recognizes summary judgment as appropriate where parties dispute "elusive concepts" like motive or intent, but "where a plaintiff . . . makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious about

granting the employer's motion for summary judgment.'" Kelley v. Corr. Med. Servs., 707 F.3d 108, 115-16 (1st Cir. 2013).  Material issues of fact clearly exist regarding whether plaintiff experienced an adverse employment action because she filed a sexual harassment complaint.  Accordingly, the Court **DENIES** defendants' motion for summary judgment of plaintiff's Title VII retaliation claim.

## V.    Single or Joint Employer

A "strong presumption" exists that a parent corporation is not the employer of its subsidiary's employees, and it is therefore deemed a separate employer unless it meets the "joint employment" test or the "integrated employer" test.  Engelhardt v. S.P. Richards Co., 472 F.3d 1, 4 (1st Cir. 2006).  In her motion for partial summary adjudication, plaintiff claims that all of the corporate Deloitte entities are a single, or "integrated" employer for the purpose of Title VII liability.  (Docket 248 at p. 12.) She then hastily relies on the joint employer theory to hold the Deloitte entities liable under Title VII.[7]  Id. at p. 13.

_____

[7] The Court chastises plaintiff for her undeveloped argument regarding the single and joint employer theories.  Although she cites case precedent setting the standards behind the theories, she fails to apply the law to the facts of her case.  Instead, she merely argues that the evidence demonstrates that that the Deloitte entities were "an integrated or single employer," and that "[a]ll the corporate defendants had control over the conditions of [her] employment."  (Docket 248 at p. 12.)  The Court reminds plaintiff that "a litigant has an obligation to spell out its arguments squarely and distinctly," Aguiar-Serrano v. P.R. Hwys. & Transp. Auth., 916 F. Supp. 2d 223, 234 (D.P.R. 2013).

Defendants argue that they cannot be held liable under either theory, and that plaintiff's only employer was Deloitte Tax. (Dockets 228 & 284.)  The Court sets forth material facts pertinent to the tests and addresses each in turn.

A.    **Material Uncontested Facts**

Deloitte Tax, Deloitte Services, and Deloitte & Touche are subsidiaries of Deloitte LLP. (Dockets 227-1 at p. 2; 293-1 at p. 4.)  Deloitte LLP has ownership interests in the other Deloitte entities, and its policies apply to its subsidiaries, including Deloitte Tax and Deloitte & Touche.  (Dockets 230-1 at p. 24; 284-1 at p. 29; 227-1 at pp. 2-3; 293-1 at pp. 4-5.)  Deloitte Services provides support for the function-specific subsidiaries of Deloitte LLP, such as Deloitte Tax and Deloitte & Touche.  (Docket 227-8 at p. 3.)  Deloitte LLP's Administrative Policy Release ("APR") applies and dictates the human resources policies on harassment and equal opportunity employment to each of its subsidiaries.  (Docket 227-15.)  Mr. Geoffrey Horst, the managing partner of Florida and Puerto Rico for Deloitte Tax, explained that the human resources department set the process of providing feedback to Deloitte Tax employees after their evaluations occurred at the bi-annual consensus meetings.  (Docket 294-8 at pp. 19-20.)  The APR also dictates the complaint procedure for an individual to follow to report any harassment complaint.  (Docket 227-15 at pp. 2-3, 11-17.)  Pursuant to the APR, however, each subsidiary "reserves

the right to adopt, amend, or discontinue this APR as it may deem appropriate, at any time, in whole or in part, for any reason or in the absence of a particular reason, and without prior notice, consent, or approval." Id. at pp. 1, 4, 8, 11, 14, 18, 22. A Service & Access Agreement ("SAA") also exists between, *inter alia*, Deloitte LLP, Deloitte & Touche, Deloitte Services, and Deloitte Tax in which Deloitte Services receives a fee in exchange for providing services to any recipient firm or its subsidiaries. (Docket 227-10.) Pursuant to the SAA, all employees of Deloitte Services who provide services to subsidiaries like Deloitte Tax are "deemed for all purposes in connection with such Services . . . to be employees . . . of Deloitte Services and not employees . . . of any Recipient Firm or its Subsidiaries." (Docket 227-10 at p. 8.) Section 9.12 of the SAA voices the proposed relationship of the parties:

> Nothing in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of a partnership, joint venture or similar relationship among the Parties hereto and/or any of their respective Subsidiaries, and no Party or Subsidiary thereof shall be deemed to be the agent of any other Party or Subsidiary thereof by virtue of this Agreement, it being understood and agreed that neither the method of computing compensation or any other provision contained herein shall be deemed to create any relationship among the Parties hereto and/or any of their respective Subsidiaries other than the relationship of independent parties contracting for services.

(Docket 227-10 at p. 25.)

Plaintiff was originally hired by Deloitte & Touche in
1990, resigned in 1996 and after being out of Deloitte until 1999,
accepted the position of tax manager at Deloitte & Touche on
January 24, 2000.  (Dockets 1 at p. 5; 119 at p. 5.)  On or about
June 3, 2007, Deloitte Tax issued a memo to plaintiff stating that
it was becoming plaintiff's employer, by virtue of a
reorganization.  (Dockets 1 at p. 5; 119 at p. 5; 227-5.)  Deloitte
& Touche "created multiple entities, one of which was Deloitte
Tax."  (Docket 236-2 at pp. 8-9.)  Plaintiff's base salary was paid
by Deloitte Tax, and Deloitte Tax paid monthly premiums for
plaintiff's medical, dental, and basic life insurance, as well as
her long term disability coverage and pension plan contribution.
(Dockets 227-1 at p. 2; 293-1 at p. 3; 229-16 at pp. 3-4.)
Ms. Teresita ("Tere") Pascual, however, signed a verification of
present employment on September 2, 2010, representing that
plaintiff was a tax manager for Deloitte & Touche.  (Docket 293-5.)
Mr. Horst testified that Deloitte Services provides Deloitte Tax
with administrative assistants and secretarial services in San
Juan; a financial team that produces internal financial statements
of the practice; and a real estate team that performs "facilities
type" duties like lease negotiations.  (Docket 294-8 at p. 23.)  He
testified that "most all internal services — services not to our
clients, but administrative type things, operational type things in

terms of running our business — are housed within Deloitte Services LLP." Id.

        Mr. Horst did not have day-to-day dealings with plaintiff, and he relied upon defendants Castillo, Villate and Corretjer as partners and directors in the Deloitte Tax San Juan office to provide feedback regarding day-to-day practices. (Docket 294-8 at pp. 2-3.) He speaks with defendants Castillo, Villate and Corretjer several times per month to discuss financial operations, marketplace strategy, and any significant decisions with respect to the practice. (Docket 236-2 at p. 10.) Mr. Horst "would not have made a decision to terminate [plaintiff] without consulting Paco [Castillo], Ricky [Villate] and Michelle [Corretjer]." (Docket 294-8 at p. 3.)

        Mr. Horst was not involved in reviewing or preparing the performance evaluations of the employees at Deloitte Tax in San Juan; the managers, partners, and directors prepared the evaluations of the employees below them, and they would meet twice a year at a consensus meeting with Mr. Horst to discuss the evaluations. (Docket 236-2 at pp. 10-11.) At the consensus meeting, a human resources representative from Deloitte Services — Maria Vilorio — took notes and prepared a summary of the results for Mr. Horst's later review with Partners, Principals and Directors ("PPD"). Id. at pp. 10-14. Ms. Vilorio oversaw and was consulted on human resource matters, compensation matters, and goal

setting matters in the San Juan Deloitte Tax office.  Id. at p. 21.
Ms. Pascual, also from Deloitte Services, assisted Ms. Vilorio on
day-to-day matters as well.  Id. at pp. 21–22.  Mr. Horst spoke
with Ms. Vilorio about people at Deloitte Tax in San Juan who were
performing below expectations.  Id. at pp. 33–34.  E-mails exist
demonstrating that Ms. Vilorio communicated with Mr. Horst and
defendants Castillo and Villate regarding plaintiff's performance.
Id. at p. 36; Docket 295-4.  The decision to issue the PIP to
plaintiff was a joint decision made by Mr. Horst, defendant
Castillo, and Ms. Vilorio.  (Docket 236-2 at pp. 31, 40-41.)  At
Mr. Horst's direction, Ms. Vilorio drafted the PIP, using input
from plaintiff's evaluations.  (Docket 229-9 at pp. 11-12.)
Mr. Horst, defendant Villate, and defendant Castillo then issued
the PIP to plaintiff in a meeting.  (Docket 294-8 at p. 6.)

> **B.    Single, Integrated Employer Test**

Pursuant to the "single employer" or "integrated
employer" doctrine, two nominally separate companies may be so
interrelated that they constitute a single employer subject to
liability under Title VII.  Torres-Negron v. Merck & Co., Inc., 488
F.3d 34 (1st Cir. 2007) (relying on NLRB v. Browning-Ferris Indus.,
Inc., 691 F.2d 1117, 1122 (3d Cir. 1982)).  A classic example of a
"single employer" situation may be parent and wholly-owned
subsidiary corporations, or separate corporations under common
ownership and management.  Arculeo v. On-Site Sales & Mktg.,

L.L.C., 425 F.3d 193, 198 (2d Cir. 2005).  To determine whether a single employer exists, Courts consider the four factors of the "integrated-enterprise    test":[8]    (1)    common    management; (2) interrelation between operations; (3) centralized control over labor relations; and (4) common ownership.  Torres-Negron, 488 F.3d at 42 (citing Romano, 233 F.3d at 662).  Keeping in mind that all four factors are not necessary for single-employer status, courts apply the test flexibly, placing special emphasis on the control of employment decisions.  Id.

        Applying the four-factor single employer test, the Court finds that there is enough evidence in the record to survive summary judgment.  Deloitte Tax, Deloitte & Touche, and Deloitte Services are subsidiaries of Deloitte LLP, and as such they share common  ownership.   No  evidence  has  been  presented,  however, regarding the first factor of management of the companies.  With respect to the "interrelation between operations" factor, there is ample evidence of a reciprocal relationship between Deloitte Tax,

---

        [8] The "integrated-enterprise test" is the standard adopted by most circuits.  Torres-Negron, 488 F.3d at 42; Romano v. U-Haul Int'l., 233 F.3d 655 (1st Cir. 2000).  Although the First Circuit Court of Appeals has not explicitly decided which of the tests is appropriate, the Court joins numerous other district courts within the First Circuit which interpret Torres-Negron to indicate that the "integrated-enterprise" test should be followed.  See, e.g. Melendez-Fernandez v. Special Care Pharm. Servs., 2012 U.S. Dist. LEXIS 146705, 10 (D.P.R. 2012) (Casellas, J.); Masso v. City of Manchester, 2012 U.S. Dist. LEXIS 42457, 7-8 (D.N.H. 2012); Anderson v. Theriault Tree Harvesting, Inc., 2010 U.S. Dist. LEXIS 4538, 25-28 (D. Me. 2010).

Deloitte & Touche, Deloitte Services, and Deloitte LLP.  Although
the nature of each corporation's business may be distinct, there is
evidence of an interchange between Deloitte Services and Deloitte
Tax employees, as Ms. Pascual and Ms. Vilorio — who are Deloitte
Services employees — managed human resources in the Deloitte Tax
San Juan office.  A centralized system of administrative and human
resources functions, therefore, appears to exist.  A significant
amount of evidence weighing in favor of the control of labor
relations element has also been presented.  The Deloitte LLP-
established, company-wide human resources and personnel policies
are applicable to all of its subsidiaries, including Deloitte Tax.
Moreover, at least one Deloitte Services employee — Ms. Vilorio —
directly participated in Deloitte Tax's consensus meetings,
followed up on plaintiff's employment evaluations and performance,
and drafted plaintiff's PIP, which allegedly led to her dismissal.
Although Deloitte Tax paid plaintiff, provided her benefits and
retained the power to terminate her, a Deloitte Services employee
— Ms. Pascual — represented that Deloitte & Touche was plaintiff's
employer.  At the very least, the evidence in the record creates an
issue of material fact as to whether Deloitte Tax, Deloitte
Services, Deloitte & Touche, and Deloitte LLP are one single
employer for purposes of Title VII retaliation liability.  It is
plaintiff's burden at trial to demonstrate, however, that each
company or entity had an active participation concerning the

conditions of plaintiff's employment.  Romano v. U-Haul Int'l., 233
F.3d 655, 665-68 (1st Cir. 2000).  Defendants' motion for summary
judgment, therefore, is **DENIED.**

    **C.   The Joint Employer Test**

       "In contrast to the single employer inquiry — where the
question is whether two allegedly separate entities comprise a
single enterprise — the joint employer inquiry focuses on which of
two, or whether both, defendants control, in the capacity of
employer[,] the labor relations of a given group of workers."
Polo-Echevarria v. Centro Medico del Turabo, Inc., 2013 U.S. Dist.
LEXIS 84002, 10-11 (D.P.R. June 13, 2013) (Besosa, J.) (citing
Rivas, 929 F.2d at 820, n.16) (internal quotations and citations
omitted).  "A joint employer relationship exists where two or more
employers exert significant control over the same employees and
share or co-determine those matters governing essential terms and
conditions of employment."  Rivera-Vega v. Conagra Inc., 70 F.3d
153, 163 (1st Cir. 1995) (citations omitted).  "Whether joint
employer status exists is essentially a factual question."  Id.
at 163.  To determine whether a joint employer status exists, the
Court considers a host of factors, including: supervision of the
employee's day-to-day activities; authority to hire, fire, or
discipline the employee; authority to promulgate work rules,
conditions of employment, and work assignments; participation in
the collective bargaining process; ultimate power over changes in

employer compensation, benefits and overtime; and authority over
the number of employees.  Id.

        The Court does not find sufficient evidence from which a
reasonable jury could conclude that Deloitte & Touche, Deloitte
Services, and/or Deloitte LLP was a joint employer of plaintiff's
with Deloitte Tax.   Deposition testimony of Mr. Horst and
defendants Castillo, Villate, and Corretjer demonstrate that
Deloitte Tax's partners and directors were the only actors with
significant power over the conditions of plaintiff's employment.
As partners and directors of Deloitte Tax, defendants Castillo,
Villate, and Corretjer controlled plaintiff's day-to-day
operations; promulgated work rules like plaintiff's schedule; set
conditions of her employment; and gave her work assignments.  They
generally oversaw her work at the office and evaluated her
performance in order to provide Mr. Horst with monthly updates as
to the office's tax practice.  At the bi-annual consensus meetings,
the only people with the authority to discuss plaintiff's progress
and performance with Mr. Horst were defendants Castillo, Villate,
and Corretjer, because they were the highest ranking employees left
in the room.  (Docket 236-2 at pp. 12-14.)  Moreover, they had
ultimate power over firing plaintiff; Mr. Horst explained that he
never would have fired plaintiff without first having consulted
them.  Although Ms. Vilorio also attended the consensus meetings
and played a role in drafting the PIP, the record does not indicate

that anyone at Deloitte Services had the power to supervise
plaintiff's day-to-day activities or to hire, fire, or discipline
her. Ultimately, that authority rested in the hands of Deloitte
Tax's partners and directors — Mr. Horst, defendant Castillo,
defendant Villate, and defendant Corretjer. Accordingly, the Court
rejects plaintiff's contention that Deloitte Services, Deloitte &
Touche, Deloitte LLP and Deloitte Tax exercised sufficient control
over the essential terms of plaintiff's employment to constitute
joint employers under Title VII.

## VI. Commonwealth Claims

Plaintiff's Commonwealth claims for sex discrimination
pursuant to Laws 100, 17, and 69, as well as her age discrimination
claim pursuant to Law 100, are virtually identical to her Title VII
and ADEA claims. Thus, the success of plaintiff's Commonwealth
claims hinge on the success of her Title VII and ADEA claims.
Because her Title VII sex discrimination and ADEA age
discrimination claims fail to survive summary judgment, the Court
also concludes that no reasonable jury would be able to find for
plaintiff on the Commonwealth claims for the same reasons.
Accordingly, defendants' motion for summary judgment on plaintiff's
Commonwealth claims for sex and age discrimination pursuant to
Law 100, sexual harassment pursuant to Law 17, and sex
discrimination pursuant to Law 69, is **GRANTED.**

## VII. Article 1802 Claim

Article 1802 is Puerto Rico's general tort statute; it provides that a person who "causes damages to another through fault or negligence" shall be liable in damages.  P.R. Laws Ann. tit. 31, § 5141.  Defendants argue that the provisions of the Puerto Rico Civil Code are supplementary to special legislation like Laws 100, 17 and 69, and that a special law prevails over a general law like article 1802.  (Docket 226 at p. 37–38.)  Several courts within the District of Puerto Rico have spoken on this issue and support defendants' position.  See, e.g., Medina v. Adecco, 561 F. Supp. 2d 162, 175 (D.P.R. 2008) (Gelpi, J.); Denis Rosario v. McConnell Valdes, 2008 U.S. Dist. LEXIS 13113, at *3–6 (D.P.R. Feb. 21, 2008) (Cerezo, J.).  The Puerto Rico Supreme Court has explicitly addressed the interplay between causes of action arising under article 1802 and special employment statutes.  See Santini Rivera v. Serv. Air, Inc., 137 D.P.R. 1, 1994 Juris P.R. 121 P.R.-Eng. 909,527 (1994).  Because the Puerto Rico Supreme Court has clarified that "[a]s a general rule, in the face of conduct by an employer that has been typified and penalized by special labor legislation, the employee only has recourse to the relief of said Act, and is barred from seeking additional compensation under [article 1802]," Santini Rivera, 137 D.P.R at 16 (Hernandez-Denton, C.J., concurring), the Court therefore finds that plaintiff's article 1802 claim in this case must be **DISMISSED.**

## VIII. Motions *in Limine*

In light of the Court's conclusions above, defendants Deloitte LLP, Deloitte Tax LLP, Deloitte & Touche LLP, Deloitte Services, LP, Castillo, Villate, and Corretjer's motions *in limine* in connection with testimony and sworn statements of Maria I. Silva-Silva, (Docket 182), and Edileen Soto-Salicrup, (Docket 176), are **GRANTED.** Plaintiff explains that Ms. Silva's testimony would pertain to the "busy season" that Deloitte Tax undergoes from mid-February to mid-July, as well as plaintiff's performance on the job, office presence, and timely billing. (Docket 182-1 at p. 4.) Ms. Silva's sworn statement, however, reveals that she left her employment with Deloitte & Touche's tax department on August 31, 2009. (Docket 284-15 at p. 1.) Because Ms. Silva left her place of employment before the events giving rise to plaintiff's retaliation and wrongful discharge claims, Ms. Silva's testimony is irrelevant to this case. Similarly, plaintiff seeks to present Ms. Soto's testimony to demonstrate that defendant Castillo made disrespectful comments and jokes in the San Juan office during her tenure. (Docket 284-14.) The Court finds that Ms. Soto's testimony also would not pertain to plaintiff's retaliation or wrongful discharge claims, however, because Ms. Soto left Deloitte & Touche in February 1992. (Docket 284-14.) Accordingly, the Court **GRANTS** defendants' motions *in limine*.

## IX.  Motions For Leave and Motions to Strike

The Court notes plaintiff's motions for leave to file sur-replies, (Dockets 323 and 325), plaintiff's supplemental motion to plaintiff's statements at Docket 294-1, (Docket 328), and defendants' motions to strike, (Dockets 321 & 347).  Because the Court is able to decide the motions for summary judgment based on the numerous and extensive briefs and evidence already submitted, plaintiff's motions for leave are **DENIED**.  The Court chastises plaintiff for submitting an eleventh-hour supplemental motion — which contained 17 revised exhibits constituting over 300 pages. It finds, however, that the submission and plaintiff's reply at Docket 313 neither prejudice defendants nor create any issue of material fact weighing in favor of plaintiff's position. Accordingly, defendants' motions to strike are also **DENIED**.

## X.  Conclusion

For the reasons discussed above, plaintiff's motion for partial adjudication, (Docket 230), is **DENIED**.  Defendants' Deloitte & Touche, Deloitte LLP, and Deloitte Services' motion for summary judgment, (Docket 227), is **DENIED**.  The Court **GRANTS IN PART AND DENIES IN PART** defendants Deloitte Tax LLP, Castillo, Villate, and Corretjer's motion for summary judgment, (Docket 225). It **GRANTS** summary judgment of plaintiff's Title VII sex discrimination and ADEA age discrimination claims.  Accordingly, those claims are **DISMISSED WITH PREJUDICE**.  The Court **DENIES** summary judgment of plaintiff's Title VII retaliation claim and

Civil No. 12-1271 (FAB)                                              35

plaintiff's Commonwealth wrongful termination claim pursuant to
Law 80.  Those causes of action remain.

Summary judgment on plaintiff's Commonwealth claims for sex
and age discrimination pursuant to Law 100, sexual harassment
pursuant to Law 17, sex discrimination pursuant to Law 69, and for
a general tort pursuant to article 1802 is also **GRANTED**.  Those
claims are **DISMISSED WITH PREJUDICE**.

Defendants' motions *in limine* in connection with testimony and
sworn statement of Maria I. Silva-Silva, (Docket 182), and Edileen
Soto-Salicrup, (Docket 176), are **GRANTED**.

Finally, plaintiff's motions for leave, (Dockets 323 & 325),
are **DENIED**.  Defendants' motions to strike, (Dockets 321 & 347),
are also **DENIED**.

**IT IS SO ORDERED**.

San Juan, Puerto Rico, November 5, 2013.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE
